UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ISAIAH JACOB HOLMES, | ) | Civil Action No. 4:24-cv-3255-MGL-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| QUANDARA GRANT, DANA AIKEN, | ) | |
| SERGEANT BLACK, OFFICER | ) | |
| JOSEPH, SERGEANT BUSH, and | ) | |
| DR. GARMEN, | ) | |
| | ) | |
| Defendants. | ) | |

## I.     INTRODUCTION

Plaintiff, who at the times relevant to this action was a pretrial detainee, brings this case pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights arising from his detainment at the Beaufort County Detention Center as well as a claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq. Presently before the Court is the Motion for Summary Judgment (ECF No. 88) filed by Defendants Col. Quandara Grant, Sergeant Aundrea Black, Officer Joey Joseph, and Lieutenant Brenda Bush of the Beaufort County Detention Center, (collectively "Government Defendants").[1] Because he is proceeding pro se, he was advised pursuant to Roseboro v. Garrison, 528 F.3d 309 (4th Cir. 1975), that a failure to respond to Defendants' motion could result in the motion being granted and his claims dismissed. Plaintiff filed a Response (ECF No. 105), and the Governmental Defendants filed a Reply (ECF No. 110).

---

[1] Nurse Aiken has been dismissed from this action. See Order (ECF No. 113). Dr. Garmen has also filed a Motion for Summary Judgment (ECF No. 133), which will be addressed by separate Report and Recommendation.

1

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d), DSC. This report and recommendation is entered for review by the District Judge.

## II.    FACTUAL ALLEGATIONS[2]

Plaintiff was incarcerated at the Beaufort County Detention Center (BCDC) as a pretrial detainee from April 17, 2022, through November 15, 2024. In his Amended Complaint, Plaintiff alleges a First Amendment retaliation claim against Nurse Dana Aiken and Director Quandra Grant for transferring him to the medical ward. He alleges upon his arrival and thereafter periodically he was transferred and housed in medical unit for medical observation even though Nurse Aiken knew he did not like being in there. He alleges Director Grant had to approve of these moves. He also complains that he was transferred to the Intake Holding #1 (IH1) observation cell when the 5 medical beds were not available. He alleges he was in isolation and lost privileges such as using the phone.

Plaintiff also alleges that Defendant Grant violated his First Amendment Religious Freedom claim because he is a Christian Israelite and his family sent him three religious books, which arrived at the jail but were never given to him. He also alleges he was denied unleavened bread for Passover.

Plaintiff alleges an Eighth Amendment denial of medical care claim against Nurse Aiken and Director Grant. He alleges that he has not received proper treatment for his Type 1 Diabetes, Osteomyelitis (inflammation of the bone), BKA (below-knee amputation), partial left foot amputation, and neuropathy. He claims that Nurse Aiken cannot treat him unless Director Grant

---

[2] Facts in the record relevant to these allegations are set forth in the Discussion section below.

approves it, and the treatment he has received has been for symptoms only and not the underlying issues. He alleges that as a result of his lack of proper treatment, his health has declined, including kidney failure, acute kidney injury, stomach inflammation, swelling in the legs, loss of vision in his left eye, toothache, and more.

Against Officer Joey Joseph, Lt. Brenda Bush, and Sgt. Aundrea Black he alleges an Eighth Amendment claim for cruel and unusual punishment/failure to protect. He claims that on February 1, 2023, he was in a fight with another inmate, and he was disciplined for this. Holmes alleges that the named officers knew of disagreements between the two over phone usage. The Plaintiff states he had been trying to avoid the other inmate for several days and had alerted these defendants. Defendants Biel[3] and Joseph had allegedly seen the other inmate "bully" Plaintiff previously and had questioned him about it. The other inmate would purportedly bully Plaintiff over who got to use the telephone in their unit, among other things. After Holmes talked to Defendants Biel and Joseph, the other inmate called Plaintiff a snitch. and said that he could no longer use the telephone in the unit. The Plaintiff states that he spoke to the four officers on six occasions about the other inmate, but they did nothing. The other inmate continued to bully Plaintiff, and when the altercation happened, Plaintiff was disciplined, but the other inmate was not.

Finally, Plaintiff asserts a claim against Defendant Grant for violation of Title II of the ADA. He alleges that upon arrival at the jail, he was placed on medical observation for seven to eight months. He alleges he was strapped to his bed 23-24 hours per day, with no ready access to a restroom, water, or showers, no recreation time unless the staff was not busy, and no privileges, phone calls, library, or exercise. Plaintiff alleges that he had no social interaction with other

---

3  Biel has been dismissed from this action. See Order (ECF No. 53).

inmates. When he was put in general population, he was kept isolated from the general population because of his medical condition. After leaving medical observation, he was transferred to IH4 for a few days and then put in B2, which is for medically challenged inmates, but he says that he was housed on the first floor but had to use the showers on the second floor, forcing him to climb stairs on his prosthetic leg while carrying his shower chair and supplies.

### III.     STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, the moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Id. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary

standard of proof that would apply at a trial on the merits." Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings. See Celotex, 477 U.S. at 324. Rather, the party must present evidence supporting his or her position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed.R.Civ.P. 56(c)(1)(A); see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

**IV.    DISCUSSION**

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Title II of the ADA. Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). A legal action under § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 707, 119 S.Ct. 1624, 143 L.Ed.2d 882 (1999). To be successful on a claim under § 1983, a plaintiff must establish two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law. West v. Atkins, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). As stated above, Plaintiff alleges a violation of his

constitutional rights, and it is undisputed that the Government Defendants were acting under color of state law at all relevant times.

Under Title II of the ADA, "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. The ADA defines "public entity" to include "any State or local government" and "any department, agency, ... or other instrumentality of a State." United States v. Georgia, 546 U.S. 151, 126 S.Ct. 877 (2006) (citing 42 U.S.C. § 12131(1)). "[T]his term includes state prisons," id. (citing Pennsylvania Dept. of Corrections v. Yeskey, 524 U.S. 206, 210, 118 S.Ct. 1952 (1998)), and county jails, see Hodge v. Randolph Cnty. Jail, No. 1:22CV448, 2023 WL 12090473, at *2 (M.D.N.C. Dec. 6, 2023), report and recommendation adopted, No. 1:22CV448, 2024 WL 5704243 (M.D.N.C. Jan. 19, 2024).

    A.    **Exhaustion of Administrative Remedies**

The Government Defendants argue first that Plaintiff has failed to exhaust his administrative remedies with respect to any of the claims raised in this action. The Prison Litigation Reform Act (PLRA) requires that a prisoner exhaust the available administrative remedies before filing a §1983 action, "or any other Federal law," concerning conditions of his confinement. 42 U.S.C.1997e(a); Fauconier v. Clarke, 966 F.3d 265, 274 (4th Cir. 2020) (holding PLRA's exhausting requirements applies to claims under the ADA). In enacting the PLRA, Congress carved out an exception to the general rule that exhaustion of state remedies is not a prerequisite to filing a civil rights suit. The PLRA amended section 1997e so that it now provides, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

6

administrative remedies as are available are exhausted." Id. § 1997e(a). Accordingly, before Plaintiff may proceed with his claims in this Court, he must first exhaust his administrative remedies. The PLRA's exhaustion requirement is mandatory and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002). It also applies to pretrial detainees held in county detention centers. Tate v. Anderson, No. C/A 805-3085-HMH-BHH, 2007 WL 28982, at *4 (D.S.C. Jan. 3, 2007); see also 42 U.S.C. § 1997e(a),(h) (defining the term "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program" and that it applies to all prisoners "confined in any jail, prison, or other correctional facility").The exhaustion requirement applies even if the relief sought in the civil action is not available in the administrative proceedings. Booth v. Churner, 532 U.S. 731, 741 (2001). Moreover, the exhaustion requirement applies whether the action was filed in federal court or was filed in state court and later removed to federal court. Blakely v. Ozmint, C/A No. 4:04-cv-22942-MBS, 2006 WL 2850545, at *2 (D.S.C. Sept. 29, 2006). A defendant bears the burden of establishing that a plaintiff failed to exhaust his administrative remedies. Custis v. Davis, 851 F.3d 358, 361 (4th Cir. 2017).

Exhaustion is defined by each prison's grievance procedure, not the PLRA, and a prisoner must comply with his prison's grievance procedure to exhaust his administrative remedies. Jones v. Bock, 549 U.S. 199, 218 (2007). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 90 (2006). A failure to exhaust all levels of administrative review is not "proper exhaustion" and will bar actions filed

by inmates under any federal law. Id.

Under the PLRA, inmates must exhaust only "available" administrative remedies. See 42 U.S.C. § 1997e(a); Ross v. Blake, 578 U.S. 632, 642–44 (2016). Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, either that exhaustion occurred or that administrative remedies were unavailable. Graham v. Gentry, 413 Fed. App'x 660, 663 (4th Cir. 2011). The Supreme Court in Ross recognized three instances where an administrative remedy is considered "unavailable;" (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the "administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use;" (3) "when prison administrators' thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 578 U.S. at 644. The Fourth Circuit has held that "a grievance process is rendered 'unavailable' under the PLRA only if an inmate actually is prevented from using it." Moss v. Harwood, 19 F.4th 614, 623 (4th Cir. 2021).

The BCDC's formal Inmate Grievance Procedure is provided in the Inmate Handbook. Grant Aff. ¶ 9 (ECF No. 88-1). Each inmate receives a copy of the Inmate Handbook upon entry into the facility during their orientation. Grant Aff. ¶ 9. It states that an informal resolution of complaints between an inmate and staff member is strongly recommended, but if the inmate cannot find an informal resolution, he can file a grievance using the Inmate Grievance Form. Inmate Handbook pp. 27-28 (ECF No. 88-3). Staff members are responsible for supplying inmate grievance forms to inmates upon request. Id. An inmate must submit the Inmate Grievance Form to the Grievance Chairman by placing it in the grievance box located in or directly outside all

housing units or using the computer kiosk within 48 hours after the incident occurs. Id.; Robinson Aff. ¶ 11 (ECF No. 91). The Grievance Chairman will review the grievance, log it into the system, and assign a staff member to investigate the grievance. Inmate Handbook pp. 27-28. The Grievance Chairman will draft an Inmate Grievance Decision to the inmate within 72 hours of receiving a report from the assigned staff member. Id.

If the inmate is dissatisfied with the Grievance Chairman's decision, he may appeal to the Director within 48 hours of receiving the Chairman's decision. Id. The inmate must write out his appeal and submit it in a sealed envelope addressed to the Director. Id. The Director's decision is final. Id.

Inmates must utilize the above procedure for all complaints except for appeals of disciplinary hearing results, appeals of classification decisions, and challenges to medical decisions. Robinson Aff. ¶ 10; Inmate Handbook pp. 27-28. Relevant here, Medical has its own grievance form and procedure for handling medical grievances to comply with HIPAA regulations, which is also described in the Inmate Handbook. Robinson Aff. ¶ 10; Inmate Handbook pp. 2, 18-20, 27-28. The Inmate Handbook states that "Medical Complaints & Medical Grievances must be filed using the Medical Complaint/Grievance procedure." Inmate Handbook p. 2. However, the Inmate Handbook does not describe the Medical Complaint/Grievance procedure.

Director Grant avers that Plaintiff routinely failed to attempt informal resolution, routinely failed to file grievances upon a single issue, often submitted requests directly to her outside of the grievance procedure, and failed to formally appeal decisions he received. Grant Aff. ¶ 15. She avers that, upon review of his file, he failed to properly exhaust his administrative remedies on any of the issues raised in his Amended Complaint. Grant Aff. ¶ 16.

9

Plaintiff does not address the Government Defendants' arguments regarding his failure to exhaust in his Response. In his Amended Complaint, Plaintiff alleges,

> I would submit complaints and/or grievances but sometimes (if not often times) I'll receive no response and other times I'll receive responses but not toward any remedial intervention. I began to write complaints in the place of grievances because of the unfair process and also because request/complaint forms seem to render a response. Due to a large amount of grievances going either missing, being disregarded, without acknowledgement and/or foul play within the proper channels of the inmate grievance procedure I decided to write letters to both the Director (Quandara Grant) and Deputy Director Robinson. On my part the grievance procedure is completed.

Am. Compl. p. 46. He asserts that he grieved issues regarding his medical concerns, including his glucose levels, record viewing, policy and protocol, classification, staff behavior, the conditions and risks the conditions "pose," and disagreements on medication types, but asserts that he did so by asking multiple nurses, who told him to talk to Dana Aiken. Am. Compl. p. 47.

He says he "grieved as well to PFC Major, Cpl. Wilson, Cpl. Wilcox, Col. Washington, pertaining to the reasoning for my classification. . . I asked these things verbatim upon the officers in and out of traffic through medical." Am. Compl. p. 48. Plaintiff alleges "another important thing I grieved was me being a type 1 diabetic" and "these things were addressed to both Dana Aiken and Dr. Garmen." Id. He alleges he grieved his diet by expressing his concerns to Dana Aiken as well as the nursing staff. Id.

Plaintiff also attaches to his Amended Complaint an Inmate Grievance Form dated either 8-2-23 or 9-2-23, in which he states that there are obvious flaws within the grievance system because grievances are completed and submitted with no response. Inmate Grievance Form (ECF No. 9-1).

There are also two responses from Major Robinson, Deputy Director of the BCDC and

10

Grievance Committee Chairman, though neither appear to be responses the grievance attached by Plaintiff. In the first response, dated December 12, 2023, Major Robinson states that all grievances she received from Plaintiff were addressed and returned to him in a timely manner. December Response (ECF No. 9-1). She also asks him to provide specific information regarding which grievances had not been answered. Id. Plaintiff wrote a letter in response, dated December 19, 2023, in which he reiterates that his grievances are never addressed. Pl. Letter (ECF No. 9-1). He states that he has the pink copies of the grievances he has submitted, but it is pointless for him to try and use them to prove that he has submitted grievances because they are not signed by officers.[4] Id. He further states that Grant and Robinson have instructed officers not to sign the forms, making them void. Id. Though he writes four pages repeating that his grievances are not being addressed, he does not provide the information requested from Robinson of the specific grievances he has submitted that have not been addressed. Id. He states that he does not want to give his original pink copies to Robinson for fear of losing them, but she can "come and make copies." Id. Though dated by Plaintiff December 19, 2023, it is marked "received on 3/14/2024 from pre-class grievance box." Id.

Also attached is another letter from Robinson to Plaintiff, dated March 13, 2024, which appears to be in response to a complaint from Plaintiff that is not in the record. March Response (ECF No. 9-1). Robinson states "I received your complaint stating you have submitted '10 or 11' grievances that have not been addressed, dating back to '11/23.'" Id. She states that the last grievance she received from him was in September of 2023 and the last request form she received

---

4 The Inmate Grievance Form states at the bottom "white/yellow copy—deposited in the grievance box" and "pink copy—inmate receipt." Under the signature line, it states "sign form and request your pink copy after the officer signs the form."

11

from him was in December of 2023, and she responded to both in a timely manner. Id. She directs Plaintiff to submit his grievances electronically going forward since all electronic grievances are time-stamped when they are submitted. Id.

As stated above, the Government Defendants bear the burden of showing that Plaintiff failed to exhaust his administrative remedies. Defendant presents the affidavit of Director Grant who avers that she reviewed Plaintiff's file and he failed to exhaust any issues raised in this case. Grant Aff. ¶ 16. However, as stated above, inmates are required to follow a different grievance procedure for grievances regarding medical decisions. There is no evidence in the record setting forth the procedure for grieving medical decisions or whether Plaintiff complied with that procedure. Here, he asserts claims arising from his placement in the medical ward and his alleged lack of treatment for his various medical conditions. The court cannot conclude based on the evidence in the record that Plaintiff did not exhaust his administrative remedies with respect to these claims.

Plaintiff also asserts claims arising from the denial of religious materials and food. Director Grant avers that Plaintiff filed numerous requests to staff and sent letters to her, but he did not follow the grievance procedure with respect to these claims. Grant Aff. ¶ 20. As stated above, Plaintiff does not address exhaustion in his Response to the present motion. Though he asserts in his Amended Complaint that he filed grievances and "sometimes (if not often times)" he would not receive a response, he also stated that he stopped filing grievances and started submitting requests/complaints. Further, though he listed the issues he "grieved," Am. Compl. pp. 47-48, he does not allege that he filed any grievances regarding the denial of religious materials or food.[5]

---

5 Though Plaintiff uses the word "grieved" he describes the manner in which he did so as speaking with various staff members about his complaints. While this may satisfy the first step of informal resolution, it does not satisfy

Plaintiff also raises claims in this case arising from an altercation he had with another inmate, in which he argues that Defendants Joseph, Bush, and Black failed to protect him from a known risk of harm. Director Grant avers that Plaintiff never filed a grievance with respect to his claim that these Defendants failed to protect him from harm. Grant Aff. ¶ 25. Again, Plaintiff does not address this argument in his Response and does not list this incident in his Amended Complaint as one of the issues he "grieved."

"[P]roper exhaustion of administrative remedies [ ] 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Woodford, 548 U.S. at 93 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). It is undisputed in the record that Plaintiff did not take all the required steps in BCDC's Inmate Greivance procedure with respect to the denial of religious material and food or the failure to protect him from harm. The Government Defendants presented evidence by way of affidavit testimony that Plaintiff did not fully exhaust as to these issues.

As stated above, once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show either that exhaustion occurred or that administrative remedies were unavailable. Graham, 413 Fed. App'x at 663. Plaintiff did not address exhaustion at all in his Response. Though he addressed grievances in his Amended Complaint and specifically set forth the issues that he did "grieve," he did not include religious issues or failure to protect issues. To the extent he intended to assert in his Amended Complaint that the grievance procedure was unavailable, he fails to show that he was he was "actually [ ] prevented from using it." Moss, 19 F.4th at 623. "If an inmate is able to access a grievance process despite . . . 'machinations,' then

---

the next step, which requires the submission of an Inmate Grievance form to the Grievance Chairman.

13

that process is 'capable of use' by him." Id. (citing Ross, 578 U.S. at 644-45). In his Amended Complaint, Plaintiff alleged that when he did file grievances, he "often times" would not receive a response, and, thus decided to start writing complaints or letters to the Director "in the place of grievances." Am. Compl. p. 46. This is insufficient to show that the grievance process was unavailable to him. Accordingly, dismissal of Plaintiff's claims arising from religious issues (First Amendment Religious Freedom) and failure to protect issues (Eighth Amendment Protection from Violence) is appropriate.

Plaintiff's remaining claims all arise from medical decisions in some form.[6] Because there is no evidence in the record as to how an inmate is supposed to exhaust his administrative remedies with respect to medical decisions, other than the Inmate Handbook stating that is a separate procedure from the Inmate Grievance procedure, the court will address the Government Defendants' arguments as to the merits of those claims.

**B.     First Amendment Retaliation**

The record reflects that Plaintiff entered the facility as an amputee with a reported history of uncontrolled Diabetes, so a medical assessment with the medical contractor was conducted. The Beaufort County Detention Center contracts with an independent medical contractor, Mediko Correctional Healthcare, Inc., to provide physicians, nursing staff, and prescription services and management to inmates. Medical and mental health care decisions are made by professional

---

6 The Inmate Handbook states that "MEDICAL TREATMENT/DIAGNOSES CAN NOT BE ADDRESSED USING THE DETENTION CENTERS GRIEVANCE SYSTEM (see medical: complaints/grievances on page 2)." Inmate Handbook p. 20. Page 2 of the handbook states only that "Medical Complaints & Medical Grievances must be filed using the Medical Complaint/Grievance procedure," but does not set forth what that procedure is. Besides not providing the steps for the Medical Complaint/Grievance procedure, the Inmate Handbook is also unclear as to exactly what types of claims that procedure encompasses. The facts giving rise to his Eighth Amendment claim for deliberate indifference to his serious medical needs clearly falls within this separate grievance procedure. In addition, Plaintiff's First Amendment Retaliation Claim is based on his placement in the medical unit and his ADA claim arises from the basic necessities and privileges he allegedly lost as a result of being placed in the medical unit.

medical and mental health contractors. Grant Aff. ¶ 7. Upon his initial intake examination, Mediko medical staff found slowly healing wounds at the amputation site and uncontrolled levels of blood sugar. Medical staff determined that Plaintiff had an increased risk of complication that warranted placement into the medical unit so that medical staff could attempt to regulate his blood sugar and best determine a medication/maintenance plan. Lawson[7] Aff. ¶ 14 (ECF No. 93). The decision to place an inmate in the medical unit is made by Mediko when an inmate meets medical criteria that the treating physicians and medical staff feel necessitate frequent monitoring in the medical unit. Lawson Aff. ¶ 10. Contrary to Plaintiff's allegations, Neither Director Grant, nor any staff of BCDC, directed the placement of Plaintiff or removal of Plaintiff from the medical unit. This placement is strictly a medical decision based upon his health condition. Lawson Aff. ¶ 10; Grant Aff. ¶ 19. Plaintiff was housed in the medical unit and in available medical observation cells under physician's orders until he reached medical stability. Dr. Garman of Mediko provided written Medical Clearance for Plaintiff to be transferred from the medical unit to a BCDC close custody housing unit on August 8, 2022. White[8] Aff. ¶ 13 (ECF No. 92); Lawson Aff. ¶ 11.

As stated above, Plaintiff alleges that medical staff placed Plaintiff in the medical unit in retaliation for filing grievances against medical staff and Director Grant approved the placement. "[T]o state a colorable retaliation claim under Section 1983, a plaintiff 'must allege that (1) [ ]he engaged in protected First Amendment activity, (2) the defendant[ ] took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendant['s] conduct.'" Martin v. Duffy, 858 F.3d 239, 249 (4th Cir. 2017) (citing Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499

---

7 Mediko Physician Dr. Louie Lawson.
8 Classification Supervisor Cpl. Janetha White.

(4th Cir. 2005)). Plaintiff's retaliation claim fails at the second step as applied to Director Grant because there is no evidence in the record that she made any decisions regarding Plaintiff's placement in the medical unit. A non-medical prison official generally cannot be held liable for decisions regarding an inmate's medical treatment where that inmate is under the care of medical personnel. Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990) (holding that non-medical personnel are entitled to rely on the professional judgment of medical practitioners to determine appropriate treatment for a patient); see also Iko v. Shreve, 535 F.3d 225, 242 (4th Cir. 2008)(holding " '[i]f a prisoner is under the care of medical experts ..., a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands' ") (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)). Because there is no evidence in the record that Director Grant took any action that adversely affected his First Amendment rights, i.e., no evidence that she participated in the decision to place Plaintiff in the medical unit, Plaintiff's retaliation claim against her fails and summary judgment is appropriate.

      **C.**    **Medical Indifference**

A pretrial detainee's claim of constitutionally inadequate medical care is governed by the Fourteenth Amendment, not the Eighth Amendment, as asserted by Plaintiff. Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021). Nevertheless, "a pretrial detainee makes out a violation at least where [the detainee] shows deliberate indifference to serious medical needs under cases interpreting the Eighth Amendment." Id.

Plaintiff alleges that he did not receive proper treatment for his Type 1 Diabetes, Osteomyelitis (inflammation of the bone), BKA (below-knee amputation), partial left foot amputation, and neuropathy. He claims that Nurse Aiken cannot treat him unless Director Grant

16

approves it. This claim fails as well for similar reasons set forth above. To establish a claim of deliberate indifference against non-medical prison staff, a plaintiff must show that the non-medical personnel (1) were personally involved in the treatment or denial of treatment, (2) deliberately interfered with treatment, or (3) tacitly authorized or were indifferent to the medical provider's conduct. Howell v. Walrath, No. 1:20-cv-1193, 2021 WL 5881803, at *5 (E.D. Va. Dec. 10, 2021); see Coleman v. Stevenson, No. 0:09-cv-872-HMH, 2010 WL 2990737, at *4 (D.S.C. June 22, 2010) ("Mere knowledge is not sufficient to establish personal participation."), report and recommendation adopted by, 2010 WL 2990740 (D.S.C. July 26, 2010), aff'd, 407 F. App'x 709 (4th Cir. 2011); Mallett v. Johnson, No. 8:08-cv-863-PMD, 2008 WL 5351618, at *7 (D.S.C. Dec. 22, 2008) ("A medical indifference claim is not appropriate against a superintendent/supervisor absent an allegation that he was personally connected to the treatment received.") (citing Vinnedge v. Gibbs, 550 F.2d 926, 928 (4th Cir. 1977)). Dr. Lawson avers that none of the Government Defendants interfered with Plaintiff's access to medical services or with the provision of medical care determined by medical staff. Lawson Aff. ¶ 2. Plaintiff fails to present any evidence to the contrary. Therefore, his medical indifference claim against Director Grant is without merit, and summary judgment is appropriate.

### D.     Title II of the ADA

Finally, Plaintiff alleges that, as a result of his placement in the medical unit, he was deprived access to basic necessities and privileges in violation of Title II of the ADA. This claim fails as well. As stated above, Title II of the ADA applies solely to public entities. See 42 U.S.C. § 12131(1) (stating that "[t]he term 'public entity' means ... any State or local government [or] any department, agency, special purpose district, or other instrumentality of a State or States or local

17

government"). "[T]he proper defendant under a Title II claim is the public entity or an official acting in his official capacity." Everson v. Leis, 556 F.3d 484, 501 n.7 (6th Cir. 2009). "Title II of the ADA does not ... provide for suit against a public official acting in his individual capacity." Id. (collecting cases); see also Barnes v. Young, 565 F. App'x 272, 273 (4th Cir. 2014) (same). Plaintiff explicitly brings this action against Director Grant in her individual capacity. Am. Compl. p. 2. Therefore, summary judgment is appropriate.

## V.    CONCLUSION

For the reasons discussed above, it is recommended that the Government Defendants' Motion for Summary Judgment (ECF No. 88) be granted and that Defendants Grant, Joseph, Bush, and Black be dismissed from this case.

                                                s/Thomas E. Rogers, III
                                                Thomas E. Rogers, III
                                                United States Magistrate Judge

January 16, 2026
Florence, South Carolina

**The parties are directed to the important information on the following page.**